```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION
```

WENDELLA69, INC., f/k/a
SOUTHWEST FLORIDA
VETERINARY SPECIALISTS
INC.; WENDY G. ARSENAULT;
and MICHAEL J. ARSENAULT,

      Plaintiffs,

v.                            Case No:  2:22-cv-539-JES-KCD

PETVET OPERATING, LLC,
f/k/a PETVET CARE CENTERS
(FLORIDA), LLC,

      Defendant.
_____

## OPINION AND ORDER

This matter comes before the Court on defendant's Amended Motion to Dismiss Count I of Plaintiffs' Second Amended Complaint. (Doc. #148).  Plaintiffs filed a Response in Opposition. (Doc. #150.)  Also before the Court are Responses (Docs. ##152, 153) to the Court's Order to Show Cause (Doc. #151.)  For the reasons set forth below, the motion is granted and Count I of the Second Amended Complaint (Doc. #146) is dismissed without prejudice.

**I.**

The Second Amended Complaint and documents the Court may consider at the motion to dismiss stage of the proceedings establish the following:

The parties are Plaintiffs Wendella69, Inc. (f/k/a/ SW. Fla.

Veterinary Specialists, Inc.), Wendy G. Arsenault, and Michael J. Arsenault (collectively "Sellers" or plaintiffs) and Defendant PetVet Operating, LLC (f/k/a PetVet Care Centers (Fla.), LLC) ("Buyer", PetVet or defendant).  On December 24, 2019, Sellers sold their veterinary practice (the "Business") to Buyer pursuant to an Asset Purchase Agreement (the "Agreement").  Exhibit A of the Agreement (Exhibit A) provides that, in addition to substantial payments due at Closing, the Buyer may be obligated to pay an "Earnout Payment" at the end of a two year "Earnout Period."  This essentially provided Sellers an additional two years after Closing for the Business's sales price to increase.  (Doc. #53-1, p. 35.) The Earnout Payment was to be calculated by a formula that subtracted "Target EBITDA" from "EBITDA" at the end of the Earnout Period and multiplied the result by five.  (Id.)  Thus, if the EBITDA exceeded the Target EBITDA, Buyer was required to pay Seller an additional amount (the "Earnout Payment") equal to the EBITDA, minus the Target EBITDA, multiplied by five.  (Earnout Payment = (EBITDA – Target EBITDA) X 5).

If there was a disagreement over the Earnout Payment, Exhibit A provided a detailed, multi-step dispute resolution process. (Id. at p. 35.) Step One required Buyer to deliver its EBITDA determination to Sellers "no later than sixty (60) days after the end of the Earnout Period."  (Id.)  Step Two allowed Sellers "reasonable access" to Buyers' books and records "relating to the

calculation of EBITDA," but only "during regular business hours" and only "for the sole purpose of verifying Buyer's computations of the EBITDA." (Id.)  Step Three gave Sellers "thirty (30) days" after receiving Buyers' EBITDA determination to submit a "Notice of Disagreement" should they "disagree[] in good faith with Buyer's determination of EBITDA."  (Id.)  The Notice of Disagreement was required to "set forth in reasonable detail the basis for the disagreement."  (Id.)  Step Four required that Sellers and Buyer "shall attempt in good faith to resolve and finally determine the amount of EBITDA."  (Id.)  Step Five provided that if Sellers and Buyer could not resolve their disagreement within "fifteen (15) days" after Buyer's receipt of the Notice of Disagreement, "the parties shall retain the services of [a] Neutral Auditor to resolve the disagreement and make a determination with respect thereto." (Id.)

Section (g) of Exhibit A defined "Neutral Auditor" as "an independent accounting firm selected by Buyer which does not have a material relationship with Buyer or Seller." (Id.)  Section (d) of Exhibit A provided:

> . . . The Neutral Auditor shall then determine the EBITDA and such determination by the Neutral Auditor shall be binding upon the parties hereto, provided, however, that EBITDA determined by the Neutral Auditor shall be no greater than EBITDA determined by Seller and no less than EBITDA determined by Buyer. The determination of the Neutral Auditor shall be made as an expert and not as an arbiter and shall be based solely on the written submissions by Buyer and Seller and their

- 3 -

>respective representatives and any other communication requested by the Neutral Auditor, and the determination shall not be by independent review. Buyer and Seller shall use their commercially reasonable efforts to cause the Neutral Auditor to complete its review thereof within fifteen (15) days of its appointment. If such a review by a Neutral Auditor is conducted, then the party (i.e., Buyer, on the one hand, or Seller, on the other hand) whose calculation of EBITDA is furthest from EBITDA determined by the Neutral Auditor shall pay all fees and expenses of the Neutral Auditor associated with such review.

(Id.)  Section (d) closes with the parties' agreement that the Auditor's "determination . . . shall be conclusive, final and binding." (Id.)

On March 25, 2022, Buyer delivered its EBITDA determination to Sellers.  (Doc. #148, p. 4, citing Doc. #146, ¶ 22.)  Within thirty days, Sellers sent Buyer a Notice of Disagreement.  (Doc. #1-3.)  The Notice of Disagreement stated that Sellers "do not agree with the EBITDA calculation" and set forth the Sellers' reasons.  Buyer and Sellers did not resolve their disagreement within fifteen days, and Buyer selected a Neutral Auditor.  (Doc. #148, p. 4.)

On July 26, 2022, prior to any determination by the Neutral Auditor, Sellers filed a Complaint in state court (Doc. #1-2), which Buyer timely removed to federal court based on the complete diversity of citizenship. (Doc. #1, ¶¶ 3-4; Doc. #1-2, p. 58.) Because of the pending lawsuit, the Neutral Auditor never rendered a determination of the EBITDA or Earnout Payment.  (Doc. #146, ¶

41, Doc. #148, p. 3.)  In due course Buyer filed its Answer and Affirmative Defenses to that Complaint.  (Doc. #24.)  In its Third and Fourth Affirmative Defenses, Buyer asserted that:

> The Complaint is subject to dismissal for improper venue, and Plaintiffs are not entitled to any relief because the [Agreement] provides that the "determination of the Neutral Auditor shall be conclusive, final and binding upon the parties."
>
> [ . . . ]
>
> Plaintiffs are not entitled to any relief in this action because they have failed to satisfy conditions precedent to commencing this action, including complying with and exhausting the dispute resolution procedures set forth in Section 7.15 of the [Agreement], and, to the extent that the audit process set forth in the [Agreement] is reviewable by the Court, completing the same. Therefore, Plaintiffs' claims are not ripe for adjudication.

(Id. at 8.)

On October 4, 2023, Buyer filed a sealed motion for judgment on the pleadings, asserting that Sellers "are barred from adjudicating, in this Court, any claim that [Buyer] improperly calculated EBITDA or the Earnout Payment and seeking damages based on any alleged difference between [Sellers'] and [Buyer]'s calculations."  (Doc. #53, p. 2.)  The Court ultimately denied the motion, concluding that the case as pled in the original Complaint was only a "books and records" dispute and lacked any "allegations challenging the determination of EBITDA."  (Doc. #123, pp. 8-9.)

A settlement conference held on December 2, 2024, was unsuccessful.  (Docs. ##126, 134.)

Sellers thereafter filed an Amended Complaint (Doc. #144), which was superseded by the now-operative Second Amended Complaint ("SAC") (Doc. #146.)  The SAC contains two counts, both alleging breach of contract.  Count I asserts that Buyers breached the Agreement in four ways: (1) failing to deliver a timely determination of EBITDA for the calculation of the Earnout Bonus; (2) failing to provide Sellers reasonable access to Buyer's records for the purpose of determining EBITDA and Target EBITDA under the Agreement and challenging Buyer's determination of EBITDA; (3) failing to calculate EBITDA properly using the same formula or accounting principles used to determine Target EBITDA; and, (4) failing to calculate the Earnout Bonus properly under the Agreement.  (Id., ¶ 67.)  In Count I Sellers seek damages for having not timely received a proper Earnout Bonus (Id., ¶ 68) and damages for the determination of EBITDA and payment of the Earnout Bonus. (Id., ¶ 70.)

In Count II, Sellers re-allege one of the breach of contract claims alleged in Count I - failure to provide reasonable access to books and records as required by the Agreement.  Sellers seek injunctive relief to compel Buyers to provide them with reasonable access to Seller's books and records, including "the original documents from which any excel spreadsheet was created, relating to the calculation of the Target EBITDA and calculation of the EBITDA for purposes of the Earnout Payment."  (Id. at pp. 15-16,

"Wherefore" clause.)

**II.**

Buyer asserts that Count I must be dismissed because the contract required Sellers to resolve the claimed breaches relating to the EBITDA through the Neutral Auditor provision in Exhibit A. Buyer further asserts that this results in both a lack of subject matter jurisdiction and the failure to state a claim upon which relief may be granted.  While this Court does have subject matter jurisdiction, Count I fails to state a claim upon which relief may be granted and must be dismissed without prejudice.

**A.  Prior Court Order**

As a preliminary matter, Buyer argues that Count I must be dismissed because a prior Order of the Court stated that "[p]lainly, the only 'disagreement' subject to the Neutral Auditor's review is the calculation of EBITDA." (Doc. #123, p. 2.) But this language addressed the original Complaint, which the Court found did not assert an EBITDA calculation claim.  Nothing in that prior Order compels a particular result in the resolution of the present motion addressing the current version of the complaint.

**B. Subject Matter Jurisdiction**

Buyer next relies on the Neutral Auditor provision of the Agreement to support its assertion that the Court lacks subject matter jurisdiction to resolve the dispute over the calculation of the EBITDA.  It is certainly true that without jurisdiction a

federal court "cannot proceed at all in any cause." Johnson v. United States Cong., 151 F.4th 1287, 1291 (11th Cir. 2025). "Federal courts are courts of limited jurisdiction" that "possess only that power authorized by the Constitution and statute." Id. Here, that subject matter jurisdiction is supplied by Article III of the Constitution and the diversity jurisdiction statute found at 28 U.S.C. § 1332. The Court therefore has jurisdiction to consider the claims in the SAC.

**C.  Neutral Auditor Contractual Provision**

While the Court has subject matter jurisdiction, parties are able to contractually withdraw a dispute from judicial determination. The parties have done so in their Agreement.

The parties agreed that, except for Section 5, the Agreement "shall be governed by and construed in accordance with the internal laws of the State of Delaware." (Doc. #53-1, Sec. 7.3.) The substantive law governing the relevant contractual disputes in this case is therefore the law of Delaware.

Delaware law establishes that contracting parties are bound by their contractual choices. See Nemec v. Shrader, 991 A.2d 1120, 1125 (Del. 2010) ("[W]e must [not] appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts" — "the law enforces both"); Libeau v. Fox, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), aff'd in pertinent part, 892 A.2d 1068 (Del. 2006)

("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations.").

Under Delaware law, an alternative dispute resolution provision may be enforced after careful consideration of and deference to the precise methodologies chosen by the parties. See Viacom Int'l, Inc. v. Winshall, 72 A.3d 78, 83 (Del. 2013) (collecting cases); Mehiel v. Solo Cup Co., No. CIV.A. 1596-N, 2005 WL 3074723, at *1 (Del. Ch. Nov. 3, 2005), aff'd, 906 A.2d 806 (Del. 2006); see, generally ArchKey Intermediate Holdings Inc. v. Mona, 302 A.3d 975, 992 (Del. Ch. 2023). Alternate dispute resolution methodologies exist on a "spectrum," with "classic" or "legal" arbitration at one end and "expert determination" at the other end. ArchKey, 302 A.3d at 990. Parties may tailor their choice of methodology so that it falls somewhere in between and borrows features from each. Id. at 990-91. Where a provision falls on the spectrum triggers varying laws which displace a court's power. Terrell v. Kiromic Biopharma, Inc., 297 A.3d 610,

617 (Del. 2023).

In 2023, the Delaware Supreme Court found the following guidance was "useful" in making the determination:

> [T]he fundamental difference between an expert determination and arbitration can be found in the type and scope of authority that is being delegated by the parties to the decision maker. In the case of a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation. The decision maker's authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact. The parties agree that the expert's determination of the disputed factual issue will be final and binding on them. The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability.
>
> If the proceeding is an arbitration, this means that the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter. The grant of authority to an arbitrator, but not to an expert, is analogous to the powers of a judge in a judicial proceeding. The parties expect the arbitrator to rule on legal claims, legal causes of action and to award a legal remedy, such as damages or injunctive relief. The parties, by agreeing to arbitration, are selecting a form of dispute resolution that by its very definition is understood as granting the decision maker the authority to make binding decisions of both law and fact.

Terrell, 297 A.3d at 618.  The Court also explained that "a hallmark of expert determinations" is that they are "attended by a larger measure of informality[,] and [that experts] are not bound to the strict judicial investigation of an arbitration." Id. (quoting Penton Bus. Media Holdings, LLC v. Informa PLC, 252 A.3d

445, 463 (Del. Ch.), judgment entered, (Del. Ch. 2018)). See also Terrell, 297 A.3d at 619 (concluding that an alternate dispute resolution clause provided for expert determination when it "only authorize[d] . . . a limited, albeit critical, legal determination [and] d[id] not empower the . . . award[ing] [of] relief, as one would expect in an arbitration").

Here, the Neutral-Auditor provision clearly falls at or near the expert determination end of the spectrum. As described above, if there was a disagreement over the Earnout Payment, Exhibit A provided a detailed, multi-step dispute resolution process: The Buyer delivered its EBITDA determination to Sellers within sixty (60) days of the end of the Earnout Period; Sellers were allowed reasonable access to Buyers' relevant books and records to verify Buyer's computation of the EBITDA; Sellers had thirty (30) days after receiving Buyers' EBITDA determination to submit a good faith Notice of Disagreement with Buyer's determination of EBITDA setting forth in reasonable detail the basis for the disagreement; Sellers and Buyer were then required to attempt in good faith to resolve and finally determine the amount of EBITDA; if there was no resolution of the disagreement within fifteen (15) days after receipt of the notice of disagreement, the parties were required to retain a Neutral Auditor to "resolve the disagreement and make a determination with respect thereto." Specifically, Section (d) of Exhibit A provided:

- 11 -

>. . . The Neutral Auditor shall then determine the EBITDA and such determination by the Neutral Auditor shall be binding upon the parties hereto, provided, however, that EBITDA determined by the Neutral Auditor shall be no greater than EBITDA determined by Seller and no less than EBITDA determined by Buyer. The determination of the Neutral Auditor shall be made as an expert and not as an arbiter and shall be based solely on the written submissions by Buyer and Seller and their respective representatives and any other communication requested by the Neutral Auditor, and the determination shall not be by independent review. Buyer and Seller shall use their commercially reasonable efforts to cause the Neutral Auditor to complete its review thereof within fifteen (15) days of its appointment. If such a review by a Neutral Auditor is conducted, then the party (i.e., Buyer, on the one hand, or Seller, on the other hand) whose calculation of EBITDA is furthest from EBITDA determined by the Neutral Auditor shall pay all fees and expenses of the Neutral Auditor associated with such review.

(Doc. #53-1, p. 35.)  The Auditor's "determination . . . shall be conclusive, final and binding."  (Id.)

### D. Waiver of Neutral Auditor Provision

Sellers argue, however, that Buyer has "waived any right to demand arbitration . . . as to the calculation of EBITDA . . . by actively participating in this litigation, taking actions inconsistent with the right to demand arbitration and otherwise acting in a manner that would make arbitration inequitable." (Doc. #146, ¶ 62.)  While an alternate dispute resolution provision can be waived, the record does not support a waiver in this case.

The Eleventh Circuit has stated that "[o]ur waiver doctrine is typically implicated when parties have 'invoked the litigation machinery' before reversing course and claiming that arbitration

- 12 -

was the proper avenue all along." Payne v. Savannah Coll. of Art & Design, Inc., 81 F.4th 1187, 1201 (11th Cir. 2023), quoting Gutierrez v. Wells Fargo Bank, NA, 889 F.3d 1230, 1236 (11th Cir. 2018) (alteration adopted and quotation omitted). Delaware law also recognizes that an arbitration provision may be waived by litigating. CSC Upshot Ventures I, L.P. v. Gandhi-Kapoor, 326 A.3d 369 (Del. 2024)("This Court has identified three elements that must be satisfied to support a finding of waiver: (1) there must be a requirement or condition to be waived, (2) the waiving party must know of the requirement or condition, and (3) the waiving party must intend to waive that requirement or condition.")(citations omitted.)

From the start of the case (and before), Buyer has constantly asserted that the Earnout Payment must be determined by the Neutral Auditor. (Doc. #24, p. 8; Doc. #53, p. 2.) Judge Badalamenti determined that Sellers' original complaint gave "no basis" for finding that their disagreement pertained to the "determination of EBITDA." (Doc. #123, p. 8.) Sellers concede that their Amended Complaint (Doc. #146) "expanded Count I . . . to clearly seek damages including the determination of EBITDA and the Earnout Bonus." (Doc. #150, p. 1.) Once that Amended Complaint was filed, Buyer immediately filed a motion to dismiss. (Doc. #148.) Buyer has consistently attempted to avoid "the litigation machinery" in this case, which conduct is clearly

not indicative of waiver of the Neutral Auditor provision.

### E. Neutral Auditor's Authority Over Count I Claim/Relief

The next issue is whether the claim and requested relief in Count I fall within the scope of the Neutral Auditor's authority as vested by the Agreement. Count I of the SAC alleges that Buyers breached the Agreement in four ways: (1) failing to deliver a timely determination of EBITDA for the calculation of the Earnout Bonus; (2) failing to provide Sellers reasonable access to Buyer's records; (3) failing to calculate EBITDA properly; and (4) failing to calculate the Earnout Bonus properly. (Doc. #146, ¶ 67.) Sellers seek damages consisting of the Earnout Bonus (Doc. #146, ¶ 70) and damages for the delay in receiving a proper Earnout Bonus. (Id., ¶ 68.)

Neither the components of the breach of contract claim nor the requested damages are disputes which may properly be resolved by the Court. The Agreement clearly requires the amount of the EBITDA and the Earnout Payment to be determined by the Neutral Auditor, and that determination is final and conclusive. Here, all the alleged breaches of the Agreement fall within the purview of the Neutral Auditor as components of determining the Earnout Payment. See e.g. Stone v. Nationstar Mortgage LLC, 2020 WL 4037337 (Del. Ch. Jul. 6, 2018) (finding claims within the purview of the expert independent accountant where they "involve[d] critical inputs to the core determination that the Independent

- 14 -

Accountant must make[.]"); <u>Belknap Holdings, LLC v. Midwest Prototyping, LLC</u>, 2024 WL 4441958, at *3-4 (Del. Super. Oct. 8, 2024) (finding disputes ancillary to the calculation of an earnout payment including (1) qualifying sales, (2) qualifying customers, and (3) qualifying revenue within the purview of the accounting firm charged with calculating the earnout payment.); <u>Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P</u>, 2015 WL 1897659, at *11 (Del. Super. Jan. 31, 2020) (finding that disputes regarding accounting methodology were appropriately for the expert because "the parties would not have selected an [independent accounting firm] to serve as an 'expert' if all they wanted that firm to do was to engage in a bean-counting exercise.").

**F.  Count II of SAC**

Buyer's Motion to Dismiss does not address Count II, which seeks an injunction compelling reasonable access to Buyer's books and records pursuant to Exhibit A.  Count II seems problematic to the Court for several reasons.  First, the only basis for the claimed injunctive relief – the alleged failure to comply with the contractual provision governing access to records for the calculation of the EBITDA amount – has now been determined to be an issue for the Neutral Auditor.  Second, under Delaware law the ordinary remedy for breach of contract is an award of damages, and injunctive relief may not be available.  Third, even if the issue was for the Court and injunctive relief is an available remedy,

- 15 -

the matter appears to be moot because Sellers have now received access to all the books-and-records required by the Agreement.[1] <u>Purpose Built Fams.</u>, 95 F.4th at 1352 (explaining that mootness occurs when "later events deprive the court of the power to grant meaningful relief"). The Court will direct the parties to advise the Court as to their views of the status of Count II.

Accordingly, it is now

**ORDERED:**

1. Defendant PetVet Operating, LLC, f/k/a PetVet Care Centers (Fla.), LLC's Amended Motion to Dismiss (Doc. #148) is

---

[1] The Court has ordered Buyer to produce, *inter alia*: (1) "[a]ll documents relating to the calculation of Target EBITDA," (Doc. #105, ¶ 1.a; Doc. #85, p. 12); (2) "[a]ll financial reports, financial statements, attachments, schedules, supporting documents, and other preparatory workpapers used to calculate Target EBITDA of $1,390,420," (Doc. #105, ¶ 1.b; Doc. #85, p. 13); (3) subject to certain parameters, "[e]lectronic backup of or electronic access to QuickBooks, QuickBooks Online, Sage, Quicken or any other electronic bookkeeping, accounting or financial recordkeeping software programs maintained by or on the Business' behalf, together with any applicable password(s), if password protected, (Doc. #105, ¶ 1.c; Doc. #85, p. 15); (4) subject to certain parameters, "[a]nnual . . . and monthly [purchase] and sales journals, revenue journals, [inventory reports,] or other records, specific to the operations of the Business substantiating revenues from sales, services, [inventory purchases,] and any other sources, from January 2020 through present date, printed in pdf format and then also exported to Excel, reflecting dates of service, client/customer names, services or sales amounts, payment details, services provided, cost associated with service, [purchase dates, vendor names, quantity, cost, payment details, usage dates,] Entered/Last Modified detail, account split detail, and with expanded columns to ensure all information is legible," (Doc. #105, ¶ 1.d; Doc. #85, pp. 16-17); (Doc. #105, ¶ 1.e; Doc. #85, p. 17.)

**GRANTED.**

2. Count I of Plaintiffs Wendella69, Inc. f/k/a/ Sw. Fla. Veterinary Specialists, Inc., Wendy G. Arsenault, and Michael J. Arsenault's Second Amended Complaint (Doc. #146) is **DISMISSED WITHOUT PREJUDICE.**

3. The parties shall advise the Court within **TEN (10) DAYS** of the date of this Opinion and Order as to their views as to the status of Count II.

**DONE AND ORDERED** at Fort Myers, Florida, this __24th__ day of October 2025.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Parties of record